T.C. Memo. 2001-124


UNITED STATES TAX COURT


ARTHUR C. BRINCAT, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

EDGAR J. BRINCAT, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 14637-97, 18178-98.          Filed May 25, 2001.


Arthur C. Brincat, pro se in docket No. 14637-97.

Donald Del Grande, for petitioner in docket No. 18178-98.

Daniel J. Parent, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined a deficiency in income tax for each petitioner in these consolidated[1] cases as follows:

---

[1] These cases have been consolidated for purposes of trial,
(continued...)

Arthur C. Brincat--1989 income tax deficiency of $37,366 and additions to tax of $9,341.50 and $2,527.02 under sections 6651(a)(1)[2] and 6654, respectively; Edgar J. Brincat--1989 income tax deficiency of $31,470 and a $6,294 penalty under section 6662(a). The deficiencies stem from the common issue of whether the proceeds from the sale of a building that was owned by a charitable entity, but which were ultimately received by petitioners, were taxable to petitioners. We also consider whether the period for assessment had expired at the time that respondent mailed the notice of deficiency to Edgar J. Brincat. With respect to Edgar J. Brincat, we consider whether he is entitled to deduct $20,000 in attorney's fees in connection with the settlement of his father's estate. Finally, we consider whether petitioners are liable for the additions to tax or penalty determined by respondent.

### FINDINGS OF FACT

Petitioners Arthur C. Brincat (Arthur) and Edgar J. Brincat (Edgar) resided in the State of California at the times that their petitions were filed in their respective cases. Arthur did not file a Federal income tax return for the 1989 taxable year.

---

[1](...continued)
briefing, and opinion.

[2] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the taxable year under consideration.

Sometime in 1973 or 1974, petitioners' father, Victor Brincat (Victor), founded Magna Carta University (Magna Carta), which was intended to operate as a nonprofit educational institution, consisting of a college of law, undergraduate colleges, and other education programs. From Magna Carta's founding until Victor's death in October 1988, Victor was president of Magna Carta. Initially, Magna Carta was a section 501(c)(3) tax-exempt organization, but respondent, during 1991, revoked Magna Carta's tax exemption retroactive to January 1, 1982. Around 1973, Victor donated to Magna Carta a building located at 301 Linden Avenue, South San Francisco, California (the building), which he had purchased for $65,000.

About 2 weeks before his death, Victor established and transferred all of his property to the Victor Victory Trust (the trust). Victor and petitioners were the beneficiaries of the trust. Victor named Arthur and Edgar as co-trustees of the trust. Edgar was summoned to his father's deathbed after many years of alienation and was advised by his father of the arrangement. After Victor's death, Arthur became president of Magna Carta and negotiated the sale of the building for $980,000 to a California partnership. An initial deposit of $60,000 for escrow was received with $350,000 due before closing, along with an executed note in the amount of $568,064 payable to Magna Carta and secured by a deed of trust.

On October 26, 1988, Arthur, as president of Magna Carta, transferred $49,000 of the $60,000 initial deposit to the trust. On January 26, 1989, Magna Carta received $350,000 from the sale of the building, and Arthur transferred $272,100 of the proceeds to the trust. On that same date, $135,550 was transferred from the trust to Edgar. From January 26 through February 2, 1989, Arthur was transferred $136,550 from the trust. Arthur, as president of Magna Carta, assigned the $568,064 note to the trust. Edgar's involvement with the trust and Magna Carta was nominal and without knowledge of the legal nuances.

Before Victor's death, the State of California brought an action against Victor in which the State court held that Victor used Magna Carta's assets for his own benefit and that Magna Carta was his alter ego. After Victor's death and the sale of the building, the California attorney general's office filed a complaint seeking a dissolution of Magna Carta and the appointment of a receiver. Arthur and Edgar were named in the complaint as defendants, both individually and as co-trustees of the trust. On November 30, 1989, the Colusa County Superior Court (the court) granted a summary adjudication, holding that the transfer of at least the $272,100 by Arthur to the trust was a nullity as a matter of law and that all transfers of money from the sale of the building were property of Magna Carta. It was argued that Victor had lent money to Magna Carta and that the

transfer of the building was in repayment of the loan.  In that regard, the court held that Magna Carta was the alter ego of Victor and that transactions between Victor and Magna Carta were a nullity as a matter of law and could not be relied upon by Arthur or Edgar.  It was also held that the $568,064 note assigned to the trust should be returned to Magna Carta.

On April 9, 1990, the court ordered Arthur and Edgar to turn over $330,000 they had received to the receiver for Magna Carta. Arthur and Edgar appealed, and on August 30, 1993, the California appellate court affirmed the lower court.  The appellate court found that Arthur and Edgar were in privity with Victor and that they were collaterally estopped from relitigating the prior holdings piercing the corporate veil and thereby nullifying alleged loan obligations owed by Magna Carta to Victor.

Neither Arthur nor Edgar has returned the $136,550 or $135,550 he received from the sale of the building.  They have continually contended that the amounts received were inheritances from their father.  Edgar, who was a disabled fireman, had no relationship or involvement with Magna Carta before the time that he became a trustee of the trust.  Edgar had been summoned to his father's deathbed and was told that the trust was being created to transfer ownership of his father's assets to him and his brother, Arthur.  For 10 years before that time, Edgar and his father were alienated and had no communications.  Edgar, at the

time of his tax return preparation, inquired of his return preparer about whether an inheritance from his father was taxable. Edgar was not knowledgeable about the legal proceedings brought by the State. He believed that because he had already received the money from his father's trust, it was his inheritance. The return preparer, a certified public accountant who specialized in taxation and who had prepared Edgar's returns since 1969, after hearing the facts of which Edgar was aware, advised that it was not taxable.

On Edgar's 1989 Federal income tax return, he reported three items of income as follows: $3,122 interest, $1,419 gross business receipts, and $7,405 as a nontaxable pension. Edgar's 1989 Federal income tax return was timely filed on October 15, 1990, pursuant to extensions to file granted by respondent. On September 5 and 6, 1996, the Internal Revenue Service and Edgar signed an agreement consenting to extension of the period for assessment of his 1989 tax year to December 31, 1997. On May 20 and 29, 1997, a similar consent was executed to extend the period to December 31, 1998. The notice of deficiency for the 1989 tax year was mailed to Edgar on August 27, 1998.

A 1989 return was not filed for Victor, the trust, or Magna Carta. Victor's estate was not probated, and an estate tax return was not filed for Victor's estate. Magna Carta paid an

attorney $40,000 to represent it in the above-described proceedings.

OPINION

Are Petitioners Required To Include in Gross Income the Amounts Received From the Sale of the Building?

Respondent contends that petitioners diverted $272,100 ($136,550 and $135,550) from Magna Carta through the trust to themselves and that those amounts are taxable to them. Respondent sees this as nothing more or less than the "income from whatever source" referenced in section 61(a). See also North American Oil Consol. v. Burnet, 286 U.S. 417 (1932). Conversely, petitioners contend that these amounts are simply inheritances from their father's estate planning trust and are excluded from gross income in accord with section 102(a). Petitioners base their contention on the premise that Victor had lent money to Magna Carta and the proceeds of the sale of the building were merely repayment of amounts owed Victor. Respondent argues that petitioners are collaterally estopped from asserting that Magna Carta owed Victor any portion of the proceeds of the sale of the building or that they are entitled to any portion of the $272,100 from the estate of Victor, the trust, or Magna Carta. We agree with respondent.

Once a factual finding or holding is "actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a

different cause of action involving a party to the prior

litigation." Montana v. United States, 440 U.S. 147, 153 (citing

Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979)).  In

Peck v. Commissioner, 90 T.C. 162, 166 (1988), affd. 904 F.2d 525

(9th Cir. 1990), we set forth the following prerequisites for

application of collateral estoppel involving a factual dispute:

> (1) The issue in the second suit must be identical in all respects with the one decided in the first suit. * * *

> (2) There must be a final judgment rendered by a court of competent jurisdiction. * * *

> (3) Collateral estoppel may be invoked against parties and their privies to the prior judgment. * * *

> (4) The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision. * * *

> (5) The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation. * * *

> [Citations omitted.]

A State court holding may form the basis for collateral estoppel

in this Court if the use of collateral estoppel is allowed in the

State's courts.  See Bertoli v. Commissioner, 103 T.C. 501, 507-

508 (1994).  The offensive use of collateral estoppel is

permitted in California.  See Imen v. Glassford, 247 Cal. Rptr.

514 (1988).

We consider here two California proceedings involving

petitioners' family, Magna Carta, and the trust.  The first,

- 9 -

Department of Educ. v. Magna Carta Univ., No. 287846 (Cal. Super. Ct. Aug. 14, 1986), involved Victor and his relationship to Magna Carta.  In that proceeding, it was held that Victor "used the * * * assets of Magna Carta for the personal benefit of himself and his family" and accordingly that Magna Carta was Victor's alter ego.  The second proceeding, Van De Kamp v. Magna Carta Univ., No. 17526 (Cal. Super. Ct. Apr. 9, 1990), addressed the very question we consider in this proceeding:  Who was entitled to the proceeds from the sale of the building?  In the second case, the superior court again held that Magna Carta was the alter ego of Victor and that the transactions (loans) between Victor and Magna Carta were "a nullity as a matter of law, and that those transactions cannot be relied upon by * * * [Arthur and Edgar]".  The court further held that "all money transferred by Arthur C. Brincat to the Victor Victory Trust from the down payment of $410,000 is the property of Magna Carta University".  The California Court of Appeals for the Third District affirmed the holdings in the second case and also held that Arthur and Edgar were in privity with Victor in connection with Victor's earlier proceedings and were collaterally estopped from relitigating issues in the earlier cases.

The effect of these holdings negates even the possibility that petitioners' funds were inheritances received from the trust.  The requisites for collateral estoppel have been met in

that: The issue as to ownership of the funds is identical, the holding of the California courts are final, petitioners were parties in one proceeding and found to be in privity with Victor in the earlier proceeding, the issues here were necessarily litigated by petitioners in the State court proceeding(s), and there has been no change in the facts or law.

We note that petitioners were ordered by the California courts to return the $272,100 but they have not done so, and they do not argue here that they are compelled to do so. Accordingly, we hold that, for 1989, Arthur's and Edgar's receipt of $136,550 and $135,550, respectively, is income to them and does not constitute nontaxable inheritances from their father.

## Did the Period for Assessment Expire Before Respondent's Issuance of the Notice of Deficiency to Edgar?

Edgar contends that the period for assessment had expired before respondent's August 27, 1998, mailing of the notice of deficiency for Edgar's 1989 taxable year. Edgar executed consents beginning on September 5, 1996, and again on May 20, 1997, which, if effective, would have extended the period for assessment to December 31, 1998. The normal 3-year period for assessment under section 6501(a), however, would have expired on October 15, 1993, before the execution of the first consent to extend the statutory period.

Respondent contends that the 3-year assessment period is not applicable because Edgar omitted more than 25 percent of gross

income by his failure to include or report the $135,550 on his 1989 income tax return. See sec. 6501(e). On this point, Edgar argues that in order for the 6-year period of section 6501(e) to apply, respondent must prove that the $135,550 is taxable. In accord with our above holding, the 6-year assessment period was applicable at the time Edgar first consented to extend the assessment period for his 1989 tax year, and accordingly the assessment period had not expired at the time respondent mailed the notice of deficiency for Edgar's 1989 taxable year.

Whether Edgar Is Entitled to a $20,000 Deduction for Attorney's Fees

Edgar claims that he is entitled to a $20,000 deduction for attorney's fees that he alleges were paid in connection with the settlement of his father's financial affairs and/or estate. Respondent counters that Edgar has not substantiated that he paid an attorney $20,000. There is evidence that Magna Carta paid the attorney $40,000 during 1989 but no showing by Edgar that one-half of that payment was for his direct benefit or on his behalf. If it was, there would be some question of whether Edgar would also have an additional $20,000 of income that has not been reported. In addition, Edgar has not provided the Court with a legal theory under which the amount would be deductible in arriving at adjusted gross income or taxable income. On this record, we find that Edgar has failed to substantiate his entitlement to a deduction under section 162 or 212.

Whether Edgar Is Liable for the Accuracy-Related Penalty Under
Section 6662(a)

Respondent determined that a 20-percent penalty was
applicable to Edgar because of negligence, disregard of rules or
regulations, and substantial understatement of income tax.  An
understatement is "substantial" if it exceeds the greater of 10
percent of the tax required to be shown on the return or $5,000.
Sec. 6662(d)(1).  Edgar's understatement for 1989 exceeds the
threshold for application of section 6662.

An accuracy-related penalty is imposed on a taxpayer if any
portion of an underpayment of tax is attributable to either
negligence or disregard of rules or regulations or to any
substantial understatement of income tax.  See sec. 6662(a) and
(b)(1) and (2).  The term "negligence" includes any failure to
make a reasonable attempt to comply with the provisions of the
Internal Revenue Code, and the term "disregard" includes any
careless, reckless, or intentional disregard.  Sec. 6662(c).  The
accuracy-related penalty is not to be imposed if it is shown that
there was reasonable cause for the underpayment and that the
taxpayer acted in good faith.  See sec. 6664(c)(1).  Petitioners
have the burden of showing that they are not liable for the
accuracy-related penalty.  See Welch v. Helvering, 290 U.S. 111
(1933).

In support of his determination, respondent contends that
Edgar failed to report the $135,550 he received in connection

with Magna Carta, the trust, and his father's death.  Respondent argues that Edgar was aware at the time of filing his 1989 return that the court had held that the $135,550 belonged to Magna Carta and that it should be returned.  Edgar, who was alienated from his father and family, was not aware of his father's holdings or prior litigation.  He believed that the amount received by him was a nontaxable inheritance from his father.  That belief was based on his father's deathbed representations and the fact that Edgar had received the $135,550 from the trust.  At the time of the filing of Edgar's return, the court's holding was being appealed on the theory that the moneys received were inheritances.  Edgar was not involved in pursuing the litigation, and he was generally unaware of the court's holdings.

Edgar had no working knowledge of Magna Carta and believed that the trust was based on his father's deathbed intent to permit Edgar to inherit from his father.  In addition, Edgar, a disabled fireman who had no background in these matters, inquired of his return preparer about whether an inheritance from his father was taxable.  Edgar provided his preparer with information about the $135,550 based on his understanding.  The return preparer, who was a certified public accountant specializing in tax and who had prepared Edgar's returns since 1969, advised that it was not taxable.

Whether Edgar acted with reasonable cause and in good faith is a factual determination.  See sec. 1.6664-4(b)(1), Income Tax Regs.  On the basis of Edgar's experience, knowledge, and education, we find that his actions were reasonable and that his reliance on his longtime preparer was also reasonable.  See, e.g., Remy v. Commissioner, T.C. Memo. 1997-72.  It is relevant that Edgar made an effort to assess his tax responsibility by seeking the advice of his accountant of long standing.  See Drummond v. Commissioner, T.C. Memo. 1997-71.  Accordingly, we hold that Edgar is not liable for an accuracy-related penalty under section 6662(a) for 1989.

Whether Arthur Is Liable for a Delinquency Addition Under Section 6651(a)(1) and/or a Failure To Pay an Estimated Tax Addition Under Section 6654

Section 6651 provides for an addition to tax of 5 percent per month, not to exceed 25 percent of the amount of tax required to be shown on a return, for failure to file.  Unlike Edgar, Arthur failed to file a return.  Arthur's failure to file went beyond the period in 1993 when the State of California's appellate court affirmed the court's holding that the money should be returned because it belonged to Magna Carta.  In this regard, as of the time of trial, Arthur continued to hold the money from the sale of the building.  Also unlike Edgar, Arthur did not rely on a tax professional.  Accordingly, Arthur has failed to show that his failure to file was, under his

circumstances, reasonable, and he is liable for the section 6651(a)(1) addition to tax for 1989.

Section 6654 provides for an addition to tax in the case of any underpayment of estimated tax, and this addition has been held to apply unless a taxpayer shows that there is some exception to application of the addition.  See <u>Grosshandler v. Commissioner</u>, 75 T.C. 1, 20-21 (1980).  Arthur has not shown that any of the so-called safe harbors apply to his case.  See <u>Swonder v. Commissioner</u>, T.C. Memo. 1994-430.  Accordingly, Arthur is liable for the section 6654(a) addition to tax for 1989.

To reflect the foregoing,

<u>Decision will be entered for</u> <u>respondent in docket No. 14637-97, and</u> <u>for petitioner as to the penalty and</u> <u>respondent as to the deficiency in</u> <u>docket No. 18178-98.</u>